No. 19,526.

THOMAS B. SAMUEL, *Appellant*, v. HENRY S. G.
THOMAS, a Minor, etc., *Appellee.*

No. 19,527.

THOMAS B. SAMUEL, *Appellant*, v. RICHARD S. G.
THOMAS and ARLENE THOMAS, *Appellees.*

SYLLABUS BY THE COURT.

ACTIONS—*To Set Aside Deeds—Fraud and Undue Influence—
Conflicting Evidence—Judgment Affirmed.* In a suit to set
aside conveyances of real estate to plaintiff's nephews, which
he alleged had been procured by fraud and undue influence,
there was a conflict in the evidence, and it is held that there
being nothing involved in the case but questions of fact, the
judgment will be affirmed.

Appeal from Brown district court; WILLIAM I.
STUART, judge. Opinion filed June 12, 1915. Affirmed.

*James M. Chaney,* and *John D. Myers,* both of Kan-
sas City, Mo., for the appellant.

*James Falloon, W. F. Means,* both of Hiawatha, and
*C. F. Reavis,* of Falls City, Neb., for the appellees.

The opinion of the court was delivered by

PORTER, J.: These two suits involve the same facts
and have been submitted together. The plaintiff seeks
to set aside deeds conveying to each of the defendants
a valuable farm of 160 acres in Brown county, each
deed retaining a life estate in the grantor. The de-
fendants are nephews of plaintiff, sons of the plaintiff's
sister, Mrs. Elizabeth Stewart. At the time of the
execution of the deeds, September 11, 1912, plaintiff
was past seventy years of age, unmarried, and had
been living at the home of another sister, Mrs. Chase,
and her husband in Hiawatha. For about a month he
had been confined to his bed with sickness, and was
under the care of a doctor and a nurse. The petition

Samuel v. Thomas.

alleged that his mind was impaired; that he was wholly unable to attend to the transaction of any business, and that the father and mother of the defendants, well knowing his physical and mental condition and relying upon the relationship of the parties, induced him to execute the deeds which afterwards the defendants placed on record; that the instruments were prepared by a scrivener a day or two before their execution, and were signed and acknowledged in the absence of plaintiff's sister, Mrs. Chase, with whom he was living, and in the absence of her husband and the nurse who had been attending him. The defendants answered with a general denial, and alleged the deeds were made voluntarily, and that he had afterwards repeatedly acknowledged and confirmed their execution and delivery. The reply was, in substance, a general denial.

The case involves nothing but facts which have been determined upon conflicting evidence against the plaintiff's contention. There was evidence offered by defendants tending to show these facts: For a number of years plaintiff at different times had expressed an intention to give these farms to his nephews and had made several wills in which he had devised one farm to Richard and the other to Henry. He advised with different friends about making conveyances instead of relying upon a will. Several witnesses testified that he told them he was afraid his will would be contested, and that he preferred to make deeds. Doctor Emery had known the plaintiff about four years and had often visited him professionally. He saw the plaintiff every day during his sickness. The doctor testified that the plaintiff was suffering from bronchial asthma and complications attendant upon old age; that soon after he was taken sick he mentioned the matter of making these conveyances, and asked the doctor to tell George Davis to make out the deeds to the boys and bring them to the house for him to sign, and said that Davis knew all about it; that he said, "I want to do some business."

The doctor said, "When you get a little stouter we will let you do business." Plaintiff said, "I want to get this off my mind, and I want to do it now." Witness said, "It can wait. It is not of the utmost importance"; that plaintiff said he had some land he wanted to give to his nephews and wished to get it done; that he was afraid he might die; that witness laughed and said: "You are in no danger of dying. . . . I guess you can wait, and we let it drop"; that at these conversations the plaintiff's mental condition was apparently as usual. The doctor further testified as follows:

"No one was present on the 11th when he told me to tell George Davis to come up. . . . I saw Davis that morning, and delivered the message. I was to see Samuel again that day with Gilbert. He phoned me that he was ready to go up to Samuel's at any time I was ready. I met him on the street and we went in my automobile."

He further testified that there was no change in the condition of the plaintiff; that the plaintiff told him that he felt better and felt first rate. "In my judgment he was in better condition than I had seen him for several days. As to mentality he was normal." He further testified that there was a suggestion made in the presence of the nurse that the plaintiff had some business with Mr. Gilbert, and she left the room; that Gilbert spoke to plaintiff about the deeds and said he had come for the purpose of having them acknowledged, and asked the plaintiff if he knew what they were for; that the plaintiff said "Yes" and asked Gilbert to read them to him; that Gilbert said, "do you know what that means," and that plaintiff said, "Yes." "Well, what does it mean?" "It means this certain property is going to Richard." The doctor further testified that at the time the plaintiff signed the deeds "he was undoubtedly mentally a competent man. . . . Seeing Gilbert had disappeared from his view beyond the threshold, he beckoned to me and I went over there, and

he said You tell Gilbert to give those deeds to George Davis and have him fix them up, and I said All right."

George Davis had been register of deeds and was an abstracter and had known Samuel for ten or twelve years intimately; had often written leases for him. He testified that the plaintiff had spoken to him about the land five or six years before in different conversations in which he said that he was going to have the Thomas boys given the land. The testimony of Davis is that when Doctor Emery told him that Samuel wanted to see him he went to Chase's home and found Samuel in bed, and said: "Well, Uncle Tom, what you want. He said, Mr. Davis, you know the thing we have talked about several times . . . relating to my land. . . . Well, he said, if you do any business for me this morning I want you to make me a promise. And I said, What will the promise be; and he said, I don't want you to tell Mr. Smith anything about this business." Smith was the man in whose office Davis worked; that plaintiff took from under his pillow a notebook, which he handed to the witness and said:

"This is the land, I have written it here, that I want to put in the name of Richard Thomas, and this is the land I wish to put in the name, I think he called him Harry Thomas, and he had the description of the land. Gwynn is sometimes called Harry. He had the name of the boy and the description of the land that he wished to put in the name of each one; and he told me to copy that onto a paper, which I did, and then he asked me for the paper, and he took it and read it and handed it back, and said that was right. He was weak. He said he wanted to retain a life interest in this property; and the deed was to be a warranty deed to these boys except his life estate. . . . He said when you get those deeds completed you have Doctor Emery come down and take my acknowledgment. I said, Uncle Tom, I can't do that, I am not a notary, and he said you have Gilbert come with Doctor Emery to take my acknowledgment. I did not see or notice any mental weakness in Samuel that morning. His mind was no different than several years previous. I prepared the

deeds.  I then called Gilbert and told him he was to go with Doctor Emery to take the acknowledgment of Samuel.  I gave the deeds to Gilbert after dinner.  I had no communication on that date, or any other time, with reference to making these deeds with the parents of the boys.  Never talked with them about it, nor they with me.  Samuel told me previous to making these deeds that he had a will willing this to these boys, that he thought it would be more to his liking to make a deed to each, because he wanted to know absolutely himself that this land was going where he desired it to go..  He expressed a fear that Mr. Chase would break his will."

After the deeds had been recorded and a notice of that fact published in the newspaper there was considerable comment in the neighborhood, and the old gentleman left the Chase home and went to live with the Thomases.  There was evidence to the effect that he had voluntarily told a number of his friends at different times about the execution of the deeds and inquired if they had read about it in the paper and that he seemed to feel well pleased and proud of the gifts to his nephews.  There is no question that he subsequently changed his mind, and he seems to have fallen out with the Thomases and returned to live with the other sister, Mrs. Chase.  A few days after going to her home he brought this suit.  There is a conflict in the evidence, and, as observed, there is nothing involved in the case but questions of fact.

It is insisted that the burden was on the defendants to show that the deeds were obtained without undue influence.  There was, however, no evidence of any fiduciary relation existing between plaintiff and the defendants, nor evidence to show that their parents influenced him at the time the deeds were executed, although he does testify that Mrs. Thomas, the mother of the defendants, was and had been for some years continually "pounding at him," to convey the land to her sons.

In a case tried by the court where both sides have availed themselves of an opportunity to introduce all their evidence, the question upon which rests the burden of proof is of no importance unless the ruling of the trial court upon that question indicates a misconception of the principles of law which control the case. The record discloses nothing to indicate that the judgment is based upon erroneous views respecting the burden of proof. We are unable to concur in the suggestion in plaintiff's brief that "a broad and thoughtful consideration of all the testimony will lead the court to the irresistible conclusion that these deeds were not procured in fair dealing." There was abundant evidence to support the judgment and it will be affirmed.